The **HARRY FOX AGENCY, INC.,** Plaintiff,

v.

**MILLS MUSIC, INC.,** and Marie Snyder and Ted Snyder, Jr., d/b/a Ted Snyder Music Publishing Co., Defendants.

**No. 80 Civil 6993.**

United States District Court, S. D. New York.

July 15, 1982.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Nat. Music Publishers Ass'n as amicus curiae; Sidney S. Rosdeitcher, Peter L. Felcher, Daniel Victor, New York City, of counsel.

Silverman & Shulman, New York City, for plaintiff; Alan Shulman, New York City, of counsel.

Parcher & Herbert, P. C., New York City, for defendant Mills Music, Inc.; Peter A. Herbert, New York City, of counsel.

Linden & Deutsch, New York City, for defendants Marie Snyder and Ted Snyder, Jr.; Frederick F. Greenman, Jr., Alvin Deutsch, Robert C. Harris, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a case of novel impression involving the interpretation of the "derivative works exception" of the Copyright Act of 1976 (the "1976 Act") which became effective January 1, 1978. The parties to this litigation are in agreement that the material facts are undisputed; that the only issues are legal and the matter is ripe for disposition under their cross-motions for summary judgment made pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Under section 24 of the Copyright Act of 1909 (the "1909 Act"),[1] an author or composer of a work was granted copyright protection for a total period of 56 years—an initial term of 28 years and a renewal term of 28 years with the right of assignment of each term.[2] The 1976 Act extended renewal copyrights subsisting at any time within the year prior to January 1, 1978 for an additional 19 years to a total of 75 years.[3] The authors and composers are given the right to recapture the benefits of the additional 19 years by terminating grants previously made to others. However, this right of termination and recapture of the copyright by the author is subject to an exception for "derivative works," such as sound recordings of a copyrighted song. Under this exception, when such "derivative works" are created under authority of the grant before its termination, they "may continue to be utilized under the terms of the grant after its termination."[4]

Broadly stated, the dispute in this case is between a music publisher to whom an author had assigned his renewal copyright to a musical composition and the author who exercised his right of termination. The issue presented is the application of the derivative works exception (the "Exception") to determine the respective rights of the author and the music publisher to royalties generated from sound recordings of the composition that were prepared by record companies before the effective date of termination. The authors claim they or their statutory heirs are entitled to all mechanical royalties earned after termination, regardless of when the recordings were made. The music publishers claim that, notwithstanding termination, the Exception entitles them to continue to collect and share royalties as they had prior to the effective date of termination, with respect to all sound recordings prepared by record companies prior to termination under licenses issued to them by the music publishers.

The work which is the subject of the royalty income dispute is a musical composition, "Who's Sorry Now" (the "Song") written and composed in the early 1920s by Ted Snyder, Burt Kalmar and Harry Ruby as equal one-third authors (the "Authors"). A typical arrangement in the music industry is for an author to assign his copyright in a song to a music publisher. Under the assignment, the publisher issues licenses to record companies (or "record producers") authorizing them to make phonorecords from sound recordings, in return for royalty payments which the publisher shares with the songwriter or author, often on a 50/50 basis.[5] This was the pattern followed in the instance of "Who's Sorry Now."

The original copyright in the Song was registered in the Copyright Office on March 7, 1923 in the name of Waterson, Berlin & Snyder Co., a publishing company. On Feb-

---

1. 17 U.S.C. § 24 (repealed 1976).

2. *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943); 17 U.S.C. § 28 (repealed 1976).

3. 17 U.S.C. § 304(b). Thus, copyrights already in existence and in their renewal term were extended by adding 19 years to the 28-year renewal term. Copyrights in the original term of 28 years on January 1, 1978 may be renewed for an additional 47 years. § 304(a). In general, works created on or after January 1, 1978 may be copyrighted for the life of the author plus 50 years. § 302(a).

4. 17 U.S.C. § 304(c)(6)(A).

5. W. Blaisdell, The Economic Aspects of the Compulsory License, 86th Cong., 1st Sess., Copyright Law Revision, Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Judiciary Comm. 92–95, 99–100, 103 (Comm. Print 1960).

ruary 9, 1932, the trustee in bankruptcy of the company assigned the copyright to defendant Mills Music, Inc. ("Mills"), then and now engaged in the business of publishing and otherwise commercially exploiting copyrighted musical compositions. On February 11, 1932, Mills recorded the assignment in the Copyright Office as the exclusive copyright owner and publisher of the Song for the balance of the original 28-year term of the copyright. In May and June 1940, Snyder, and later his two co-authors by their individual agreements, assigned to Mills all their renewal rights to the copyright of the Song, including the exclusive right to act as the publisher of the Song. On March 1, 1951, the copyright renewal was registered by Mills in the Copyright Office.

On May 16, 1958, Mills, in accordance with the requirements of section 1(e) of the 1909 Act,[6] filed with the Copyright Office a Notice of Use on Mechanical Instruments with respect to the Song. Such a Notice is designed to notify all other persons that a musical composition is available for mechanical reproduction by payment to the copyright owner of the royalty specified in the statute and compliance with other statutory requirements.[7] Sections 1(e) and 101(e) and their successor section 115 of the 1976 Act are known as the compulsory license provisions. However, that statutory procedure is rarely invoked. Usually, record producers apply to and obtain the right to use copyrighted material from music publishers (the copyright proprietors) under licenses which contain modifications of the statutory terms.[8] These modifications are designed to encourage exploitation of musical compositions by, among other matters, lowering the statutory royalty rate, dis-

pensing with statutory notice requirements, or reducing the frequency with which accountings and payments are made. This practice was followed in the instant case.

The Harry Fox Agency, Inc. ("Fox"), plaintiff herein, for many years has acted on behalf of Mills and issued licenses with respect to mechanical recordings of the Song to producers of phonorecords. During the years 1951 to and including 1980, encompassing the renewal period under the 1909 Act, Mills either directly or through Fox issued 419 licenses to record producers permitting use of the Song in connection with the manufacture and distribution of phonorecords. Fox has collected from the record producers the royalties derived from such licensed use of the Song which were then distributed equally on a 50/50 basis as provided for by the agreement between Mills and the Authors; accordingly, each Author received his proportionate one-third of the 50% share to which he was entitled.

On January 3, 1978, defendants Marie Snyder and Ted Snyder, Jr. (the "Snyders"), widow and son of the deceased composer, Ted Snyder, exercised their right under the 1976 Act as statutory heirs[9] to terminate Ted Snyder's grant to Mills at the beginning of the 19-year extension of the renewal term. Pursuant to section 304 of the 1976 Act, the Snyders served a Notice of Termination upon Mills effective January 3, 1980. That Notice terminated Ted Snyder's grant to Mills of his one-third interest in the renewal copyright in the Song subject to applicability of the Exception.

Since the effective date of termination, Fox has received from the record producers royalties in a sum equal to $5,301.03. Fox paid two-thirds of this sum to Mills[10] and

---

6. 17 U.S.C. § 1(e) (repealed 1976).

7. *Norbay Music, Inc. v. King Records, Inc.,* 290 F.2d 617, 619 (2d Cir. 1961).

8. *Recording Indus. Ass'n of America v. Copyright Royalty Tribunal,* 662 F.2d 1, 4 (D.C.Cir. 1981).

9. *See* 17 U.S.C. § 304(c)(2).

10. This portion relates to the interests of Ted Snyder's two co-authors, which are not at issue in this case. Customarily, with respect to musical compositions owned by Mills, Fox, after deducting its agency commission, remits all monies generated by Mills' compositions to Mills directly and Mills remits 50% of the monies it receives to the writers of the compositions as their share. As one of three co-equal authors, Ted Snyder is entitled to one-third of the 50%.

has retained the balance of $1,767.01, that is, one-third of the total amount corresponding to the Snyders' share (the "Disputed Fund"), which sum has been deposited in Court upon the commencement of this action.[11] Mills and the Snyders each make conflicting claims with respect to the Disputed Fund and as to distributions of any future royalties.

Fox commenced this interpleader action to resolve the dispute pursuant to 28 U.S.C., section 1335, and it also seeks declaratory relief pursuant to 28 U.S.C., section 1338(a) in that the controversy arises under the federal copyright laws. Mills and the Snyders asserted counter and cross-claims and each moves for summary judgment. Their conflicting demands upon the Disputed Fund are the result of differing interpretations of provisions of the 1976 Act. Thus we turn to the pertinent provisions of the Act.

The right of termination by Ted Snyder, or as in this case, by his statutory heirs, of the renewal copyright held by Mills is not absolute. It is subject to a clearly expressed limitation. Thus section 304(c)(6) in pertinent part provides that

all of a particular author's rights ... covered by the terminated grant revert ... to that author or [his statutory heirs]. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

Analysis of the contentions of Mills and the Snyders requires a definition of terms used in this and other relevant provisions of the 1976 Act.

A work is a "derivative work" if it is substantially derived from an underlying work, and would otherwise constitute an infringement of the copyright in the underlying work but for the permission granted by the copyright proprietor thereof for its use.[12] It is not disputed that the sound recordings of the Song made by licensed record companies are "derivative works." The "sound recording" is a series of sounds constituting a performance of the Song which is first "fixed" on a master.[13] The term "fixed" as defined in section 101 of the 1976 Act[14] is synonymous with the word "prepared" as used in the derivative works exception. "Phonorecords" are material objects which are copies of the sound recordings.[15] Although the term "grant" is not defined in the Act, it is not disputed

11. Fox paid a small amount of mechanical royalties to Mills which is the subject of a cross-claim by the Snyders against Mills.

12. 1 M. Nimmer, The Law of Copyright § 3.01, at 3–3 (1982). The statutory definition is "a work based upon one or more preexisting works, such as a ... musical arrangement, ... motion picture version, sound recording, ... or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

13. " 'Sound recordings' are works that result from the fixation of a series of musical ... sounds, ... regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." *Id.* A sound recording must be distinguished from both the underlying musical composition, which is transposed into aural form by the sound recording, and the phonorecord, the ma-

terial object on which the sound recording is recorded. 1 M. Nimmer, *supra*, § 2.10[A].

14. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101.

15. " 'Phonorecords' are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'phonorecords' includes the material object in which the sounds are fixed." *Id.*

that it encompasses an assignment of the author's renewal copyright.[16]

Mills contends that all sound recordings (*i.e.*, derivative works) of the Song fixed or prepared by record companies prior to the effective date of termination pursuant to licenses issued by Fox, including the sound recordings that constitute the subject of this action, were "prepared under authority of the grant before termination" and thus are protected by the limitation of the derivative works exception and may continue to be utilized by Mills, as in the past. Accordingly, Mills claims it is entitled to receive all royalty income derived from the distribution of phonorecords made from these sound recordings subject only to Mills' obligation, as in the past, to remit 50% of such income to the Snyders in accordance with their equal one-third co-authors' share.

Contrariwise, the Snyders contend that upon termination each previously licensed record producer may continue to make and distribute phonorecords but that the Snyders are entitled to all mechanical royalties on such phonorecords to the exclusion of Mills. In sum, however phrased, under this concept the derivative works exception protects only the record producers; the author who exercised his right of termination thereafter gets all the royalties; and the publisher is out of the picture.

## I.

The Snyders first contend that the Exception does not apply to the sound recordings in this case. They argue that the recordings were not prepared "under authority of the grant" from Snyder to Mills, as the Exception requires. The Snyders do not dispute that the late Ted Snyder's assignment and that of his co-authors of their renewal copyright conveyed to Mills all the rights and authority of copyright ownership in the Song. That ownership gave Mills the right to exploit the underlying work by preparing sound recordings [17] and using the recordings to reproduce and publicly distribute phonorecords.[18] As the copyright owner, Mills had the right to exploit the underlying work directly or by licensing others to act.[19] Here, it exploited the Song by issuing or causing Fox as its agent to issue nonexclusive licenses to record companies, who in turn made sound recordings to reproduce phonorecords that were sold and that yielded royalties, including the royalties at issue. So, too, the Snyders do not dispute that Ted Snyder's assignment of the renewal copyright in the Song was a "grant" within the meaning of section 304(c) of the 1976 Act; neither do they dispute that the sound recordings at issue are "derivative works" as defined in section 101.[20] They do dispute that the sound recordings were prepared "under authority of the grant" from Ted Snyder to Mills; they contend the sound recordings were prepared under authority of the compulsory license provisions, not the grant from Ted Snyder to Mills and so are beyond the protection of the derivative works exception.

■ Nothing in the legislative history of the 1976 Act suggests that the phrase "under authority of the grant" was intended to exclude derivative works prepared pursuant to licenses issued by the assignee of an author's renewal copyright. The Snyders' contention is contrary to the plain meaning of the phrase and seeks to negate the force and effect of the assignment of Ted Snyder's renewal rights to Mills (the "Snyder Grant"). Since the sound recordings at issue were prepared by record companies under the licenses issued by Mills, and Mills issued these licenses under the authority it derived by virtue of the Authors' grants, then the rights acquired by the licensees, the record companies, flow from the Authors' grants to the licensor (Mills); without that grant the licensees would be infring-

---

16. The Snyders at one point contend that " 'the grant' [also] includes the license from Fox to the record company." Snyders' Memorandum of Law at 47.

17. *See* 17 U.S.C. § 106(2).

18. *See* 17 U.S.C. § 106(1), (3).

19. *See* 17 U.S.C. § 106.

20. Snyders' Memorandum of Law at 6.

ers. Accordingly, in preparing the derivative works pursuant to such licenses, the licensees acted "under authority of the grant."

The thrust of the Snyders' contrary position is that the licenses issued by Mills to the record companies were self-executing under the compulsory license provisions of the Copyright Acts and thus were not issued under the authority of the Authors' grants to Mills. Under these provisions, once the copyright owner has caused phonorecords of a non-dramatic musical work to be distributed to the public in the United States, any other person may obtain a non-exclusive "compulsory license" to make and distribute other phonorecords of the work by complying with notice and accounting requirements and payment of specified royalties.[21] A person obtains a compulsory license merely by complying with the statutory requirements of the compulsory license provisions.

A record company desiring to avail itself of compulsory licensing under the 1976 Act must, among other matters, give notice to the copyright owner of its intention to obtain a compulsory license before distributing any phonorecord of the work;[22] make monthly payment of royalties under oath;[23] and file detailed cumulative annual statements of account, certified by a certified public accountant.[24] In the event of default with respect to the monthly payment or the monthly or annual statements, upon notice and failure to remedy, the compulsory license is automatically terminated and the record company becomes liable as an infringer.[25] Failure to comply with the notice requirement forecloses the possibility of a compulsory license.[26]

■ The record companies in this case did not comply with the statutory requirements and, therefore, were not entitled to and did not obtain self-executing compulsory licenses. Instead, each applied to and obtained from Mills licenses issued by Mills under the grant of authority from the Authors. The licenses so obtained state that the record company is subject to all the rights and obligations of users under the compulsory license provisions, but with specified modifications.[27] All the licenses modify the statutory terms for compulsory licenses. They eliminate the notice requirement for users and reduce the frequency with which royalty payments and accountings otherwise would have to be made, and some reduce the statutory royalty rate.[28]

Under *Joy Music, Inc. v. Seeco Records, Inc.*,[29] relied upon by the Snyders to support their position, this Court held that where the parties agreed to vary the exact terms of the compulsory license section but did not intend to waive its protection, their licenses were protected under the compulsory license provisions, at least for the purpose of maintaining federal jurisdiction.[30] But *Joy Music* did not hold that these licenses were identical to pure compulsory licenses which embody all the statutory compulsory licensing terms. The Snyders' argument that the licenses in this case were self-executing under the statute ignores the negotiated terms that modified and even

---

**21.** 17 U.S.C. § 115. Prior to January 1, 1978, compulsory licensing was obtained upon compliance with similar terms of the 1909 Act, 17 U.S.C. §§ 1(e), 101(e) (repealed 1976). Implicit in the provisions in both Acts is the right to make the sound recording—that is, the derivative work—from which the phonorecords are reproduced.

**22.** 17 U.S.C. § 115(b)(1).

**23.** 17 U.S.C. § 115(c)(3).

**24.** *Id.*

**25.** 17 U.S.C. § 115(c)(4).

**26.** 17 U.S.C. § 115(b)(2).

**27.** *See* Complaint Exhs. C, D; Fox Reply to Mills Counterclaim Exh. A.

**28.** *See id.*

**29.** 166 F.Supp. 549 (S.D.N.Y.1958).

**30.** 166 F.Supp. at 550. *Accord, Shapiro, Bernstein & Co. v. Gabor*, 266 F.Supp. 613 (S.D.N.Y. 1966) (mem.); *Gershwin Publishing Corp. v. Charlie Parker Record Corp.*, No. 63–768 (S.D.N.Y. Feb. 11, 1964) (mem.); *Leo Feist, Inc. v. Derby Records, Inc.*, No. 95–227 (S.D.N.Y. Apr. 22, 1955) (judgment).

eliminated certain of the statutory terms. These terms were more favorable to the record companies than those that would have been imposed had the record companies relied exclusively on the compulsory license provisions.

The modifications of the statutory compulsory license terms contained in the licenses from Mills to the record companies were based on its authority under the grants from Ted Snyder and his co-authors. Since the record companies did not comply with all the statutory requirements, except for these licenses they would be infringers of the copyright of the Song. The modifications allowed the record companies to deviate from the royalty and other requirements of the statutory compulsory licenses, yet still lawfully prepare and exploit their sound recordings. Since Mills had authority to vary the statutory terms in these licenses solely by virtue of the Snyder Grant and those of his co-authors, it follows that all sound recordings prepared pursuant to such licenses were prepared under authority of the grants.

■■■■ The Snyders' reliance upon the holding in *Joy Music* and similar cases to support their contention that the sound recordings in this case were prepared under the mandate of the compulsory license provisions and not under the authority of the grant to Mills is misplaced. The issue in those cases was whether agreed-upon variations between a music publisher and a record company from the exact terms of the compulsory license provisions resulted in a private licensing agreement so that it was enforceable only in the state courts.[31] The holding was that the parties did not, by

their consensual arrangement, intend to waive protection of the Copyright Act, and that the federal district court had subject matter jurisdiction of the action as one "arising under" the copyright laws.[32] The case did not present, and the Court did not consider, the issue of the derivative works exception, which was not in existence at the time. The fact that an action to enforce payment of royalties under a Mills license "arises under" the Copyright Act, carrying with it federal subject matter jurisdiction, does not convert the license to one that was acquired under the self-executing compulsory license provisions of that Act; nor does it mean that the sound recordings were not "prepared under authority of the grant" so that the Exception does not apply. In this case, "under authority of the grant" refers to Mills' authority as grantee from the Authors to issue and negotiate the terms of the licenses; under *Joy Music*, the exercise of such authority upon terms different from the statutory provisions is consistent with finding that these licenses are nonetheless subject to the protection of the federal courts. Accordingly, the Court finds that the derivative works exception applies to the derivative works in the case at bar. Since these sound recordings embody performances of the Song that were recorded pursuant to licenses issued by Mills under authority of the Authors' grants, such sound recordings "were prepared under authority of the grant" within the meaning of the Exception.[33] When the Snyders terminated Ted Snyder's grant to Mills, the reversion to the Snyders of rights under the Copyright Act covered by the terminated grant was limited by the derivative works exception.[34]

---

31. 166 F.Supp. at 550; *see T. B. Harms Co. v. Eliscu*, 339 F.2d 823 (2d Cir. 1964).

32. 28 U.S.C. § 1338.

33. Moreover, if, as the Snyders argue elsewhere in their briefs (*see* Snyders' Memorandum of Law at 47), the "grant" is not limited to the Authors' grants to Mills, but includes both those grants and the licenses from Mills to the record companies, then there can be no question that the sound recordings were prepared under authority of these "grants."

34. Some commentators have suggested a different interpretation. They argue that the operation of the Exception is limited to large-scale derivative works. *See, e.g.*, A. Latman, *The Copyright Law* 93 (5th ed. 1979); Kadden, *Copyright Law*, 1978 Ann. Survey Am.L. 593, 603–04; Cohen, *"Derivative Works" Under the Termination Provisions in the 1976 Copyright Act*, 28 Bull. Copyright Soc'y 380, 391–92 (1981) (summary of argument). That restricted view of the scope of the Exception is contrary to its language, which uses the term "derivative work" without qualifying the broad definition

## II.

The Snyders next argue that even if the derivative works exception is applicable in this case Mills is not entitled to receive royalties earned after termination of the Snyder Grant.[35] They make a broad claim that the termination provision was intended to confer the entire benefit of the 19-year extension of copyright protection under the 1976 Act upon authors, composers and other creators. Here, particularly, they contend that the Exception protects only the record companies as the producers or owners of a derivative work and does not apply at all to music publishers. Thus they urge that all mechanical royalties paid by the record companies for utilization of sound recordings revert to them, to the exclusion of Mills, and that such was the Congressional intent. On the other hand, Mills claims the Exception applies to music publishers and in this case preserves Mills' right under the Snyder Grant to continue to collect 50% of the royalties after termination with respect to those sound recordings that were prepared by record companies before termination pursuant to licenses issued by Mills.

To interpret the Exception, the starting point is, of course, the statutory language,[36] which makes a sharp distinction between derivative works "prepared under authority of the grant *before* its termination" (old derivative works) and "other derivative works" prepared *after* termination (new derivative works).[37] It is desirable at this point to repeat the text of the provision which limits the reversion or recapture right of the author:

A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

The dispute between the parties is confined to old derivative works, *i.e.*, those sound recordings prepared under authority of the grant before termination. We consider their respective contentions against the background of the findings previously made

of the term in § 101 of the 1976 Act. Elsewhere in the Act, where Congress intended to treat certain derivative works differently, it did so explicitly. *See, e.g.,* 17 U.S.C. § 114(b). The proponents of the restrictive view rely on the legislative history to argue that the Exception was drafted specifically to protect the motion picture industry. However, nothing in the legislative history indicates that the Exception was understood to be so limited. Motion picture remake rights were used to illustrate its operation, but this was only an illustration; there is no indication that it was meant as a restriction. *See, e.g.,* H.R.Rep.No.1476, 94th Cong., 2d Sess. 127 [hereinafter cited as H.R. Rep.No.1476], *reprinted in* [1976] U.S.Code Cong. & Ad.News, 5659, 5743; 3 M. Nimmer, *supra,* § 11.02[B], at 11–17. On the contrary, the Authors League raised the issue by proposing that the operation of the Exception be limited to motion pictures and other large-scale derivative works, *see, e.g.,* Copyright Office, 89th Cong., 1st Sess., Copyright Law Revision, Part 5, 1964 Revision Bill with Discussion and Comments 242, 244–45, 251 (H. Judiciary Comm. Print 1965) [hereinafter cited as Copyright Law Revision Part 5], but the proposal was never acknowledged. Instead, the drafters of the Exception expressly incorporated the broad definition of derivative work in § 101 into their subsequent explanation of the Exception, and

explained that derivative works include works such as sound recordings as well as motion pictures. *See* Register of Copyrights, 89th Cong., 1st Sess., Supplementary Report on the General Revision of the U.S. Copyright Law: 1965 Revision Bill 76 (H. Judiciary Comm. Print 1965) [hereinafter cited as Supplementary Report]. The proponents of the restrictive interpretation of the Exception urge policy considerations in support of their position. However, Congress could have, but did not, distinguish between large- and small-scale derivative works, and it is not for the courts to construct such a distinction.

**35.** All references to royalties and rights in the Song are to the royalties and rights corresponding to Ted Snyder's original one-third interest in the Song which is the subject of the dispute.

**36.** *North Haven Bd. of Educ. v. Bell,* ── U.S. ──, ──, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982); *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981); *Connecticut v. Cuisinarts, Inc. (In re Grand Jury Investigation of Cuisinarts, Inc.),* 665 F.2d 24, 32 (2d Cir. 1981).

**37.** 17 U.S.C. § 304(c)(6)(A) (emphasis added).

that the sound recordings at issue are "derivative work[s] prepared under authority of the grant." There is no dispute they were prepared before termination of the grant.[38] Accordingly, it would follow under the clear language of the Exception, such sound recordings "may continue to be utilized under the terms of the grant after its termination" and, under the express terms of the Snyder Grant, Mills is entitled to continue to share equally with the Snyders all royalties from phonorecords made from those sound recordings.

The Snyders resist this conclusion. They argue the Exception does not affect the copyright of the underlying work, the Song, but applies only to the utilization of derivative works; the argument continues that Mills held the copyright only in the underlying work and never owned the sound recordings and never had any copyright in them; that the record companies held all the rights in the recordings themselves, and thus the Snyders conclude that the Exception was for the sole benefit of the record companies and not for the music publishers. However, because derivative works are substantially copied from an underlying work, utilization of a derivative work involves the copyright in the underlying work.[39] By allowing for the continued utilization of old derivative works, the Exception necessarily limits the reversion of those rights in the underlying work that are incident to this utilization of old derivative works. Thus, the Snyders' claim that the Exception does not apply to Mills because the Exception does not apply to copyright in underlying works disregards the source of the derivative works and is without substance.

Moreover, nothing in the language of the section states that the Exception applies only to the record companies and excludes music publishers. It makes no mention of derivative work owners or producers or of any distinction between grantees who themselves make or own derivative works and those who license others to do so. The Snyders seek to overcome this by emphasizing the clause in the Exception that a derivative work "may continue to be utilized" after termination and urge that it acts as a limitation that confines the benefits of the Exception to record companies as the derivative work owners and producers. However, this language clearly does not connote the inclusion of the record companies to the exclusion of the publishers who issued the licenses to the record companies. Moreover, even if the Snyders' interpretation of the word "utilize" were correct, it does not mean that the Exception is limited to derivative work owners or makers or that it does not apply to the music publishers' right to mechanical royalties under the licenses issued by them. The Exception expressly makes continued utilization of old derivative works subject to the "terms of the grant." Accordingly, all parties to a grant may continue to enjoy the benefits from the utilization of the derivative works where the terms of the grant so provide.

■ The Snyders make a further argument that all royalties revert to them because "under the terms of the grant" refers only to the relationship between the author (or his successors) and the record companies as owners of the derivative works, and prevents the record companies from obtaining any greater rights than they had prior to termination, including royalty rates. Consequently, it is urged that music publishers are not entitled to receive their share of the stipulated royalties after termination. Again, this reads language into the Exception that does not exist. The fact is that there is no relationship between the record companies and the author; there is no

---

**38.** Fifteen sound recordings were both prepared and licensed before termination. A separate and related issue exists with respect to Mills' asserted right to license after termination sound recordings prepared but not licensed prior to termination. Two of the licenses at issue are of this type and are considered separately hereafter. (*Post* pp. 868–869.)

**39.** *United States v. Taxe*, 540 F.2d 961, 965–66 n.2 (9th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977); 1 M. Nimmer, *supra*, § 3.01, at 3–2 to 3–3; *see* 17 U.S.C. § 101; *see, e.g., G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951).

grant directly between the author and the record companies. The Snyder Grant defines the relationship only between the author and Mills, including the royalty arrangement between them—that is, in return for the assignment of the renewal copyright Mills and the author share the royalties on a 50/50 basis. The royalty arrangements with the record companies are defined separately by the licenses issued to them by Mills, and the author is not a party to these licenses; the licensing arrangements are exclusively between Mills and the record companies. Nothing in the phrase "under the terms of the grant" or any other language of the Exception indicates that Mills, as the author's grantee, is deprived of its rights "under the terms of the grant" simply because it licenses others to make derivative works rather than doing so itself. In order for all the royalties from the record companies to revert to the Snyders despite the express "terms of the grant," the Court would be required to rewrite the grant so as to disregard all the references to Mills and instead substitute in their place the author or his statutory successors. Rather than following "the terms of the grant," this would nullify the grant from Ted Snyder to Mills. Thus, the Snyders' interpretation of the derivative works exception to exclude music publishers, such as Mills, requires a tortured reading of its language. By contrast, while the Exception does not specifically address the situation herein where the author's grantee licenses others to make derivative works, its language is entirely consistent with including Mills, as Snyder's grantee.

Nevertheless, the Court has searched beyond the statutory language to determine whether the legislative history or the policies underlying the Exception and the 1976 Act favor the Snyders' version.[40] This search has included a careful review of thousands of pages of Congressional committee prints, hearings and reports, and floor debates. It has also included an examination of the legislative history of section 203 [41] as well as section 304(c) of the 1976 Act. Section 203 contains a derivative works exception identical to that in section 304(c).[42] Like the latter section, section 203 provides for the termination of grants. However, while section 304(c) applies to grants executed before January 1, 1978, section 203 applies to grants executed on or after that date.[43] Further, while section 304(c) provides for termination at the beginning of the extension period, section 203 provides for termination 35 years after the date of execution of a grant.[44] The legislative history indicates that the two termination provisions and the two derivative works exceptions are intended to be applied in substantially the same way. However, the legislative history of section 203 is considerably more extensive than that of the other section; for example, in some instances the legislative history of section 304(c) simply refers to section 203.[45] Thus, the Court has considered the legislative history of both sections, although always in light of the differences between the two.

The Snyders place great weight on the legislative history, but, in fact, the legislative history of the derivative works exception is ambiguous and does not support

---

**40.** *See North Haven Bd. of Educ. v. Bell,* —— U.S. ——, ——, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982); *United States v. Perdue Farms, Inc.,* 680 F.2d 277 at 280–281 (2d Cir. 1982); *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 647, 63 S.Ct. 773, 774–775, 87 L.Ed. 1055 (1943).

**41.** 17 U.S.C. § 203.

**42.** *Compare* 17 U.S.C. § 203(b)(1) *with* § 304(c)(6)(A).

**43.** 17 U.S.C. §§ 203(a), 304(c).

**44.** 17 U.S.C. § 203(a)(3). If the grant covers the right of publication of the work, then the section provides for termination 35 years after the date of publication or 40 years after the date of execution of the grant, whichever term ends earlier. *Id.*

**45.** *E.g.,* Copyright Law Revision Part 5, *supra* note 34, at 171; H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; H.R.Rep.No.83, 90th Cong., 1st Sess. 10 (1967) [hereinafter cited as H.R. Rep.No. 83]; Supplementary Report, *supra* note 34, at 95.

their claim. The entire copyright law revision effort that culminated in the 1976 Act spans over twenty years. The legislative history is unusual in that Congress, in 1955, turned to the Register of Copyrights and the Copyright Office (individually or collectively the "Office") to lay the groundwork for revision of the copyright law. The Office drafted the first revision bills that were introduced in Congress based on a series of studies specifically authorized by Congress for the copyright law revision, extended discussions with a panel of experts and interested parties, and a preliminary draft revision bill (the "Preliminary Draft").[46] All its draft bills contained termination provisions and derivative works exceptions. Extensive hearings were held in Congress on the last bill drafted by the Office, the so-called 1965 Revision Bill.[47] While bills continued to be introduced and additional hearings held, in the main, debate over termination and the Exception ceased.[48] The

termination provisions in the 1965 Revision Bill were enacted in substantially the same form in the 1976 Act; the derivative works exceptions in the 1965 Revision Bill and the 1976 Act are identical.[49] There is no indication that either the drafters in the Copyright Office of these provisions or the Congress specifically considered the Exception with respect to music publishers. In all of the Office's panel discussions and reports, and all of the hearings, reports and other legislative materials regarding the various bills introduced in Congress, there is no discussion by either the Office or individual members of Congress about the termination of assignments or the derivative works exception specifically as they apply to music publishers. It is an unwarranted assumption that Congress itself ever gave any thought to the issue.[50] In addition, there is no discussion by the Office or by any member of Congress of the general issue of whether the Exception applies to an au-

**46.** Copyright Office, 88th Cong., 2d Sess., Copyright Law Revision, Part 3, Preliminary Draft for Revised U.S. Copyright Law and Discussions and Comments 1–36 (Preliminary Draft) (H. Judiciary Comm. Print 1964) [hereinafter cited as Copyright Law Revision Part 3]. The Office published 34 studies culminating in 1961 in the *Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law*. Register of Copyrights, 87th Cong., 1st Sess., Report on the General Revision of the U.S. Copyright Law (H. Judiciary Comm. Print 1961) [hereinafter cited as 1961 Report]. The 1961 Report contained the Register's tentative recommendations for revising the copyright law. The Office conducted panel discussions from 1961 to 1964 in which representatives of the various interests affected by the copyright law participated. The Office thereafter drafted three successive draft revision bills, the so-called Preliminary Draft, the 1964 Revision Bill (H.R. 11947, 88th Cong., 2d Sess. (1964); S. 3008, 88th Cong., 2d Sess. (1964)), and the 1965 Revision Bill (H.R. 4347, 89th Cong., 1st & 2d Sess. (1965); S. 1006, 89th Cong., 1st Sess. (1965)).

**47.** H.R. 4347, 89th Cong., 1st & 2d Sess. (1965); S. 1006, 89th Cong., 1st Sess. (1965); *see* Hearings on H.R. 4347, 5680, 6831, 6835 Before Subcomm. No. 3 of the House Judiciary Comm., 89th Cong., 1st Sess. (1965) [hereinafter cited as Hearings on H.R. 4347]; Hearings on S. 1006 Before the Subcomm. on Patents, Trademarks, and Copyrights of the Sen. Judiciary Comm., 89th Cong., 1st & 2d Sess. (1965–

1966) [hereinafter cited as Hearings on S. 1006].

**48.** The cessation of what had been vociferous debate over the termination provisions was specifically recognized in the subsequent legislative history. *See* H.R.Rep.No.83, *supra* note 45, at 90; Draft Second Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1975 Revision Bill, ch. 11, at 2 (Oct. 1975) [hereinafter cited as Draft Second Supplementary Report]. Committee reports accompanying subsequent bills adopted the explanation of the termination provisions and the Exception substantially as it appeared in the report accompanying the 1965 Revision Bill. *Compare* H.R.Rep.No.2237, 89th Cong., 2d Sess. (1966), *with* H.R.Rep.No.83, 90th Cong., 1st Sess. (1967); S.Rep.No.473, 94th Cong., 1st Sess. (1975); *and*, H.R.Rep.No. 1476, 94th Cong., 2d Sess. (1976). The subsequent delay in passage of the revision law was the result of cable television and other issues not relevant to the case at bar. *See* Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Judiciary Comm. on H.R. 2223, 94th Cong., 1st Sess. 105, 109–14, 1780 (1975).

**49.** *Compare* H.R. 4347, 89th Cong., 2d Sess. §§ 203, 304(c) (1965) *with* 17 U.S.C. §§ 203, 304(c).

**50.** *Cf. Rose v. Lundy,* —— U.S. ——, ——, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982).

thor's grantee who only authorizes others to make derivative works and is not itself the owner or producer of the derivative works.[51]

With no express statement of legislative intent as to these specific issues, the Court turns for guidance to the purposes underlying the Exception and the statutory scheme generally.[52] The Snyders argue that these policies support the exclusion of music publishers from the protection of the derivative works exception. They press that Congress extended the renewal term of copyright for 19 additional years for the sole benefit of authors, and its recapture under the termination provisions was intended to confer upon authors the exclusive benefit of the extension.

It may readily be acknowledged that the extension period is intended to benefit the author, "the fundamental beneficiary of copyright under the Constitution."[53] Pro-

tection of authors and their dependents is one of several reasons specifically identified in the committee reports accompanying the 1976 Act for lengthening the duration of copyright.[54] The arguments for granting authors a right of termination are characterized as being especially persuasive as to the extended term, since it represents a completely new property right.[55] However, this does not mean that authors were intended to be the exclusive beneficiaries of the extension. On the contrary, the statute and its legislative history clearly evidence that, where the author has assigned his copyright, Congress intended that in specified situations the benefits of the extension be shared. This intent is manifested by the very Exception, an express limitation upon the reversion of rights to authors upon termination.[56] The Snyders' claim that the termination provisions confer the entire benefit of the extension upon authors alone simply ignores the Exception.[57] It is as

---

**51.** Mention was made during the early part of the legislative history of a "grantee who has made a derivative work" and the owner of a derivative work. *See, e.g.,* H.R.Rep.No.83, *supra* note 45, at 9; Copyright Office, 88th Cong., 2d Sess., Copyright Law Revision, Part 4, Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law 39 (H. Judiciary Comm. Print 1964) [hereinafter cited as Copyright Law Revision Part 4]; Copyright Law Revision Part 3, *supra* note 46, at 278. However, there is no indication that these statements were meant as limitations on the scope of the Exception. They are ambiguous. There was no elaboration and they may only indicate that the speaker was not considering the situation where the grantee and derivative work owner or maker are separate parties. For example, there is no doubt that the scope of the Exception is broader than a "grantee who has made a derivative work," since it extends at least to makers and owners of derivative works who are licensees of the grantee. *See* text following note 20 *supra.* Alternatively, the reference in the statement to any grantee who has "made" a derivative work may include grantees who authorize others to make the derivative work, as well as those that do so themselves. Moreover, no such statements were included in the committee reports to the 1976 Act. These reports contain nothing to limit the Exception to owners and makers of derivative works. *See* H.R.Rep.No.1476, *supra* note 34; S.Rep.No.473, 94th Cong., 1st Sess. (1975) [hereinafter cited as S.Rep.No.473]; Conference Report, H.R.Rep.No.1733, 94th Cong., 2d Sess. (1976).

**52.** *See Rose v. Lundy,* —— U.S. ——, ——, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982); *Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807, 815 (2d Cir. 1981); *Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 947 (2d Cir. 1975) (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)).

**53.** H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; S.Rep.No.473, *supra* note 51, at 123.

**54.** H.R.Rep.No.1476, *supra* note 34, at 134–36, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5750–52; S.Rep.No.473, *supra* note 51, at 117–19. Other arguments for lengthening the term of copyright included in these reports were that too short a term restrains dissemination of the work by publishers and other users, and that lengthening the term would provide the benefits of uniformity with foreign laws, which generally have adopted the longer term of life of the author plus 50 years.

**55.** H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; S.Rep.No.473, *supra* note 51, at 123.

**56.** 17 U.S.C. § 304(c)(6).

**57.** The right to terminate is also subject to other express limitations, thus further manifesting Congress' concern about interests other than authors. For example, the Office first

much a part of the statute as is the right of reversion. They are inseparable.

The Snyders also ignore express statements in the legislative history indicating that the termination provisions represent an accommodation of the various interests involved. These statements show that while the provisions are intended to benefit authors and their families by giving them an opportunity to share in the benefits of the extended term, other interests were also recognized. The statements form a consistent theme throughout the history. For example, in its initial report to the House Judiciary Committee (the "1961 Report"), the Office described the interest of the authors that should be protected by the copyright laws not in absolute terms, but as "a *fair share* of the revenue to be derived from the market for their works." [58] Consistent with this notion, the 1961 Report recommended the extension of the renewal term and introduced the termination provisions as follows:

> We believe there would be little justification for lengthening the term unless the

author or his heirs were to receive some benefit from it. At the same time, the interests of their assignees must also be considered. [59]

In subsequent reports, the Office continued to describe termination in terms of an accommodation of the various interests involved. [60]

The House committee report accompanying the 1965 Revision Bill [61] and those accompanying subsequent bills, [62] including the bill that finally passed, [63] adhered to this conception of termination. The description of the termination provisions in all of these reports is substantially the same. Each report described section 304(c) as a close counterpart of section 203, [64] and each describes section 203 as follows:

> Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved. [65]

In discussing section 304(c) each report asks, not whether all rights should revert to the author or his dependents during the

proposed that assignments terminate automatically. *See* 1961 Report, *supra* note 46, at 58, 92–94; Copyright Law Revision Part 3, *supra* note 46 (Preliminary Draft § 16(a) (Alternative A)). As enacted, the termination of grants is optional and requires an affirmative act of serving notice. 17 U.S.C. § 304(c)(4). Otherwise, the grant continues in effect for the extended renewal term, unless the grant itself provides differently. § 304(c)(6)(F). In addition, the section gives the original grantee some advantage over others in renegotiating for terminated rights. *See* § 304(c)(6)(D).

**58.** 1961 Report, *supra* note 46, at 6 (emphasis added).

**59.** *Id.* at 57–58. As explained more fully below, the Office went on to recommend that assignments terminate "if the author or his heirs would otherwise receive no benefit from the lengthened term." However, as long as they received some royalties or other revenues under the assignment during the extended term, the assignment would not terminate. *Id.* at 58. This limitation of reversions to lump sum transfers was later replaced with the derivative works exception and other provisions limiting the effect of termination. *See* text at notes 71–74 *infra.*

**60.** *See* Supplementary Report, *supra* note 34, at 72; Draft Second Supplementary Report, *supra*

note 48, ch. 11, at 10 (quoted in *Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484, 494 n.11 (2d Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977)).

**61.** H.R.Rep.No.2237, 89th Cong., 2d Sess. (1966) [hereinafter cited as H.R.Rep.No.2237].

**62.** *E.g.,* H.R.Rep.No.83, *supra* note 45; S.Rep. No.983, 93d Cong., 2d Sess. (1974) [hereinafter cited as S.Rep.No.983].

**63.** H.R.Rep.No.1476, *supra* note 34; S.Rep.No. 473, *supra* note 51.

**64.** H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; S.Rep.No.473, *supra* note 51, at 123; S.Rep.No.983, *supra* note 62, at 173; H.R.Rep. No.83, *supra* note 45, at 108; H.R.Rep.No.2237, *supra* note 61, at 136.

**65.** H.R.Rep.No.1476, *supra* note 34, at 124, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5740; S.Rep.No.473, *supra* note 51, at 108; S.Rep.No.983, *supra* note 62, at 154; H.R.Rep. No.83, *supra* note 45, at 90 (identified as § 203 "of the present bill"); H.R. 2237, *supra* note 61, at 119 (identified as § 203 "of the amended bill").

extended term, but only "whether, in a case where their rights have already been transferred, the author or the dependents of the author should be given a chance to benefit from the extended term." In answering the question, each report describes section 304(c) as serving merely to provide the author with "an opportunity to share in [the extended term]." [66] These statements further undermine the Snyders' claim that all benefits are intended to revert to the author upon termination.

The Snyders' claim also ignores the purposes of the termination provisions. These provisions were introduced in response to the problem of unremunerative grants of copyright by authors.[67] Because of the impossibility of predicting the commercial value of a work upon its creation and because of the weak bargaining position of authors, they sometimes assigned their copyrights in return for very little remuneration, such as

small lump sum payments or inadequate royalty rates, and were thus prevented from sharing fairly, if at all, in the rewards from works that later became commercial successes.[68] The termination provisions give authors an opportunity to renegotiate in the light of more knowledge as to the value of their works, and thereby obtain a fair share of the rewards from their works.[69] The right of termination is especially important at the beginning of the extension period. One reason for the extension is to provide authors with a new property right and additional benefits beyond those provided under the 1909 Act. Because some authors would otherwise have foreclosed themselves from these benefits by their prior assignments, termination is necessary to give the author a chance to benefit from the extended term.[70]

But to achieve this purpose, Congress did not find it necessary to confer the entire

**66.** H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; S.Rep.No.473, *supra* note 51, at 123; S.Rep.No.983, *supra* note 62, at 173; H.R.Rep. No.83, *supra* note 45, at 107–08; H.R.Rep.No. 2237, *supra* note 61, at 136 (the last four reports refer to "his dependents" rather than "the dependents of the author").

**67.** *See, e.g.,* H.R.Rep.No.1476, *supra* note 34, at 124, *reprinted in* [1976] U.S.Code Cong. & Ad. News 5740; S.Rep.No.473, *supra* note 51, at 108.

**68.** *See id.*

**69.** The termination provisions were by no means the first attempt by Congress to deal with unremunerative transfers. Such transfers have constituted an enduring problem under the copyright laws. The 1909 Act sought to protect authors from unremunerative transfers by splitting the period of copyright into an original and a renewal term. This was supposed to provide authors with an opportunity at the time of renewal to renegotiate their transfers with respect to the renewal term. *See* H.R.Rep.No.2222, 60th Cong., 2d Sess. 14 (1909) (quoted in *Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 944 (2d Cir. 1975)); 2 M. Nimmer, *supra,* § 9.02, at 9–23. However, the renewal scheme largely failed to protect authors, because it did not prevent them from assigning their expectancy in the renewal copyright during the original term of the copyright. *See DeSylva v. Ballentine,* 351 U.S. 570, 574, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); *Fred Fisher Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943). Financial exigencies led many authors during the original term, before they knew the value of their works, to bargain away their expectancy in the renewal term with their interest in the original term. *See Landon v. Twentieth Century-Fox Film Corp.,* 384 F.Supp. 450, 458 (S.D.N.Y. 1974); 1961 Report, *supra* note 46, at 53.

The problem of unremunerative transfers and the need to replace the renewal scheme of the 1909 Act, were recognized from the start of the copyright revision process in the Office's 1961 Report. The Office proposed termination as the new statutory scheme to permit authors to renegotiate their assignments that do not give them a reasonable share of the economic rewards from their works. *Id.* at 53–55, 92–94. Congress subsequently adopted this proposal by enacting termination provisions and expressly adopting the Office's rationale for termination. *See, e.g.,* H.R.Rep.No.1476, *supra* note 34, at 124, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5740; S.Rep.No.473, *supra* note 51, at 108:

The provisions of section 203 are based on the premise that the reversionary provisions of the present section on copyright renewal (17 U.S.C. sec. 24) should be eliminated, and that the proposed law should substitute for them a provision safeguarding authors against unremunerative transfers.

**70.** H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; S.Rep.No.473, *supra* note 51, at 123.

income from the extension period exclusively upon authors, as the Snyders assert. The legislative history leaves no room to doubt that the drafters of the termination provisions in the Copyright Office and Congress both believed that the problem of unremunerative transfers and the need to afford authors an opportunity to share in the extended term would be adequately addressed by termination provisions of limited scope that ensure that authors can share in these benefits, but which also protect assignees. The Office originally proposed that the recapture rights and termination provisions apply only in instances of grants by authors for lump sum payments and not to those whereby authors shared in the royalties during the life of the copyright.[71] However, the Office abandoned the lump sum limitation as being unworkable; it could be too easily evaded by arranging for nominal royalties, and it would cloud titles.[72] The Office then proposed the derivative works exception specifically to replace the lump sum limitation proposed in its 1961 Report as a limitation on terminations.[73] The Exception was presented as also being part of a compromise between the interests of authors and their assignees that preserved the basic proposal of the 1961 Report to permit authors to renegotiate unremunerative transfers, but which in practice would work better than the lump sum limitation to give the author or his dependents a real opportunity to benefit from the extension without being unfair to assignees.[74] Significantly, the Exception was further described as "a very important limitation on the right of reversion"[75] where derivative works have been made.

Congress in the 1976 Act adopted the Office's scheme of termination by enacting a derivative works exception that, as noted above, is identical to the one in the Office's 1965 Revision Bill and termination provisions that are substantially the same. Further, the committee reports to the Act expressly affirm the understanding that termination would achieve its objective with provisions of limited scope, and that assignees would also be protected. For example, the reports characterize termination as recognizing the problems and legitimate needs of all interests involved,[76] and they describe the operation of the Exception as "[a]n important limitation on the rights of a copyright owner under a terminated grant."[77] They characterize termination under section 304(c) in particular merely as a means for giving authors "an opportunity

71. 1961 Report, *supra* note 46, at 93; *see id.* at 54.

72. *See* Copyright Law Revision Part 3, *supra* note 46, at 277–78 (statement of Assistant Register of Copyrights for Examining).

73. *See, e.g., id.* at 278 (statement of Assistant Register of Copyrights for Examining). As an alternative, the Office also proposed in its Preliminary Draft that termination or reformation be limited to cases in which "the profits received by the transferee or his successors in title are strikingly disproportionate to the compensation, consideration, or share received by the author or his successors." *Id.* (Preliminary Draft § 16(a) (Alternative B)). Section 16(b) provided that the author had the burden of proving that "the terms of the transfer have proved to be unfair or grossly disadvantageous to the author." This alternative further demonstrates the drafters' concern about ensuring that authors receive their fair share, while otherwise permitting all interests to share throughout the term of copyright protection. However, the alternative was dropped after meeting with unanimous opposition, not based on its limited scope, but because it was correctly perceived as turning on a vague standard and therefore being a fomenter of litigation. *See, e.g., id.* at 278–80, 282, 292.

74. Supplementary Report, *supra* note 34, at 71–72, 76.

75. *Id.* at 76.

76. H.R.Rep.No.1476, *supra* note 34, at 124, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5740; S.Rep.No.473, *supra* note 51, at 108.

77. H.R.Rep.No.1476, *supra* note 34, at 127, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5743; S.Rep.No.473, *supra* note 51, at 111. This passage describes the Exception under § 203. There is no reference in these reports to the Exception under § 304(c), but the two exceptions are identical and the two termination sections are described as close counterparts. H.R.Rep.No.1476, *supra*, at 140; S.Rep. No.473, *supra*, at 123.

to share" in the extended term.[78] Thus, in enacting the termination provisions with the Exception, Congress limited the benefits that revert to authors upon termination where derivative works have been prepared before termination, and it provided for a continuing sharing of these benefits under the terms of the grant. Accordingly, the legislative history negates the Snyders' claim that the purpose of the termination provision was to confer the entire benefit of the extended term upon authors or their successors.

Moreover, an interpretation of the Exception which permits the inclusion of music publishers as participants in the benefits of the 19-year extension does not defeat the purposes of the statute. It does not prevent authors from benefitting from the extension or encroach on their share of the benefits under the statute. Congress defined the author's share in terms of the rights that revert under the termination provisions, as limited by the Exception.[79] Under the limitation, as to old derivative works, the author is entitled to the share of royalties that he received prior to termination under the terms of his grant. Additional benefits from old derivative works beyond those stipulated in the grant are not part of the protection conferred upon the author under the termination provisions.[80] Indeed, had Congress not granted the 19-year extension, the Song would have entered the public domain and neither the author nor the music publisher would have received or shared royalties. Thus permitting the music publisher to share in royalties derived from old derivative works takes nothing from the author that he would have had except for the Congressional extension.

Congress ensured that authors would share in the extension by providing that upon termination all rights as to new derivative works revert to the author. Accordingly, the author is free to negotiate new grants on more advantageous terms for the making and distribution of new derivative works based on his underlying work. This is a valuable right of reversion; if the copyright in the underlying work has remained valuable for 56 years until the beginning of the extended term, then the work has become a classic and is likely to remain in demand. In fact, regaining this right to "re-exploit" the work prospectively with new derivative works, including remake rights, was of special concern to the authors' representatives participating in the revision process.[81] The statutory scheme

---

**78.** H.R.Rep.No.1476, *supra* note 34, at 140, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5756; S.Rep.No.473, *supra* note 51, at 123.

**79.** 17 U.S.C. § 304(c).

**80.** The fact that authors receive no additional benefits from their assignees' continued utilization of old derivative works after termination was not lost on the participants in the revision process. The Authors League of America, Inc., an authors' trade association, argued that the Exception should be amended so that authors could receive new benefits from old derivative works beyond those that might be provided for under the terms of the authors' grants. The League submitted written proposals to amend the Exception to condition continued use of old derivative works on the payment of a minimum royalty of 5% of the transferee's gross receipts or the compensation provided in the grant, whichever is greater. The League objected particularly to the denial to authors of any income from derivative works where the author had assigned his rights in the underlying work for a lump sum. Copyright Law Revision Part 5, *supra* note 34, at 242–45, 251. In such a case, despite termination, the author receives nothing for the continued utilization of old derivative works during the extended term since the Exception permits these derivative works to continue to be utilized under the terms of the author's grant and the grant does not provide for any royalties; even in this extreme situation, the termination provisions do not afford the authors any new right to royalties from old derivative works. Six months after the League made its proposal the Office issued its Supplementary Report to accompany the 1965 Revision Bill. However, the Authors League's proposals were not acknowledged and the Exception remained substantially unchanged.

**81.** *See, e.g.*, Copyright Law Revision Part 4, *supra* note 51, at 48–49 (statement of I. Karp of the Authors League of America, Inc.); Copyright Law Revision Part 3, *supra* note 46, at 286–87, 296 (statements of I. Karp and Leon Kellman, counsel to American Guild of Authors and Composers); Copyright Office, 88th Cong., 1st Sess., Copyright Revision, Part 2, Discussion and Comments on Report of the Register of Copyrights on the General Revision of the

embodied in the termination provisions does not distinguish among grantees and vary the protection afforded authors based on the particular grantee or its particular licensing arrangements. Permitting Mills to continue to receive its share of royalties from old derivative works under the terms of the Snyder Grant during the extension does not deprive the Snyders of either their continuing interest under the grant with respect to old derivative works or the complete reversion of their rights as to new derivative works. Thus, construing the Exception to include Mills is consistent with the statutory scheme. The music publisher need not be excluded to provide the author or his successors with their benefits under the termination provisions.

██ In addition, the policies underlying the copyright laws do not require Mills' exclusion.[82] Experience suggests that these policies are promoted by including Mills within the Exception's protection. As reflected in the Constitution,[83] the fundamental purpose of the copyright laws is to encourage the production and dissemination of artistic works for the general public good.[84] One reason why the 1976 Act extended the term of copyright protection and

provided additional benefits to authors beyond those provided under the 1909 Act, was to help encourage their creative efforts and help reward them for their contribution to society.[85]

Congress was also concerned about the dissemination of creative works by publishers and other users.[86] Artistic production does not end with completion of a creative work by the artist. The public interest depends on the broad public availability of the works.[87] Copyright protection, in addition to encouraging authors, also induces publishers and other distributors upon assignment of copyrights by authors to invest their resources in bringing creative works to the public by the prospect of a profitable return. The sharing of returns provided to publishers by the Exception encourages these activities, and thereby contributes to the widest possible dissemination of works of authorship.

██ In the music industry, music publishers play an integral part in the dissemination of musical works. Songwriters and music publishers in effect form a partnership. The songwriters assign their copyrights to music publishers and rely on them for dissemination of their songs.[88] As with

U.S. Copyright Law 258 (H. Judiciary Comm. Print 1963).

**82.** *Cf. North Haven Bd. of Educ. v. Bell,* —— U.S. ——, ——, 102 S.Ct. 1912, 1929, 72 L.Ed.2d 299 (1982) (Powell, J., dissenting) ("Only rarely may legislative history be relied upon to read into a statute operative language that Congress itself did not include. To justify such a reading of a statute, the legislative history must show clearly and unambiguously that Congress did intend what it failed to state. (footnote omitted)").

**83.** U.S.Const. art. I, § 8, cl. 8.

**84.** *See Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975); *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir. 1981); *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 23 (2d Cir. 1976); 1 M. Nimmer, *supra,* § 103[A], at 1–30.

**85.** *See* H.R.Rep.No.1476, *supra* note 34, at 134–35, *reprinted in* [1976] U.S.Code Cong. & Ad. News 5750–51; H.R.Rep.No.83, *supra* note 45, at 3; H.R.Rep.No.2237, *supra* note 61, at 32.

**86.** *See, e.g.,* H.R.Rep.No.1476, *supra* note 34, at 134, *reprinted in* [1976] U.S.Code Cong. & Ad. News 5750; S.Rep.No.473, *supra* note 51, at 117 ("In some cases the lack of copyright protection [under the 1909 Act] actually restrains dissemination of the [author's] work, since publishers and other users cannot risk investing in the work unless assured of exclusive rights"); 17 U.S.C. § 801(b)(1)(A) (statutory royalty rate should be calculated "[t]o maximize the availability of creative works to the public").

**87.** *Twentieth Century Fox Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975).

**88.** *See* text at note 5; W. Blaisdell, The Economic Aspects of the Compulsory License, 86th Cong., 1st Sess., Copyright Law Revision, Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Judiciary Comm. 93–95, 99–100 (Comm. Print 1960). It was made clear throughout the legislative history that this pattern is the norm in the music industry. For example, representatives of songwriters testified to their reliance

other grantees, permitting music publishers to share in the extended term offers opportunity for additional returns, thereby encouraging them to invest further in copyrighted musical works and thus contribute further to the dissemination of such works. Accordingly, allowing music publishers to share in the extended term by including them within the Exception is consistent with the purpose of the copyright laws of encouraging the availability of a wide variety of creative works.

No valid reason has been advanced for excluding music publishers from sharing the benefits of the extended term when other grantees are permitted to share under the terms of a grant. The Snyders argue that it is the producer of the derivative work, in this case the record company, who makes the greatest investment in the derivative work and whose efforts principally contribute to its commercial success. Yet, even they do not argue that the music publisher does not contribute to the promotion of derivative works by investing its efforts in the exploitation of the underlying work.[89] More important and aside from this, Congress did not distinguish among grantees based on the degree of their contribution; indeed, no distinction was made among grantees. It is then not for the Court to single out music publishers to whom authors assigned their renewal copyright and read into the statute their exclusion from the benefits of the derivative works exception.

The Snyders in pressing their claim rely heavily upon statements made by representatives of music publishers during panel discussions held by the Office. They contend that the music publishers understood that the termination provisions in the Office's draft revision bills would deny all revenue to publishers after termination, despite the derivative works exception; that the publishers made "repeated representations" of their understanding,[90] and that it was accepted by all the other participants of the panel discussions. Finally, they contend that Congress also adopted this understanding of the provisions when they were enacted into law eleven years later. A detailed study of the voluminous record of statements, arguments and counter-arguments made by representatives of diverse interests—the motion picture industry, record companies, music publishers, book publishers, authors, composers, screen writers and other interested groups and individuals—demonstrates that the statements relied upon by the Snyders essentially reflect only the individual views of the speaker and are not useful in ascertaining the legislative intent.

The "repeated representations" relied upon by the Snyders consist of several statements by two of a number of representatives of music publishers either made orally at the panel discussions or submitted to the Office by letter.[91] The statements of

---

on music publishers during hearings on S. 597. Senator Burdick asked Burton Lane, President of the American Guild of Authors and Composers (AGAC), how he justified sharing mechanical royalties with music publishers, who have nothing to do with the creation of a song. Mr. Lane responded:

> ... We have found through many years of experience that most writers cannot take the time to exploit the songs they write. Every moment is precious to them in order to create. So we have found it necessary to share our royalties with the publishers whose job it is to publish and exploit the songs we write. It is a partnership arrangement which has worked very well through the years.

Hearings Before the Subcomm. on Patents, Trademarks, and Copyrights, of the Senate Judiciary Comm. on S. 597, 90th Cong., 1st Sess. 882 (1967) [hereinafter cited as Hearings on S.

597]. *Accord, id.* at 377–78, 883; Hearings on H.R. 4347, *supra* note 47, at 286–88. Witnesses disagreed as to the extent of the music publishers' promotional role as compared to that of the record companies, but all agreed that music publishers at least serve administrative and other service functions, and that they performed promotional and marketing functions in the past. *Compare* Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Judiciary Comm. on H.R. 2223, 94th Cong., 1st Sess. 1400 (1975) *with id.* at 1651–52.

89. Snyders' Reply Memorandum of Law at 2.

90. Snyders' Memorandum of Law at 38.

91. *Id.* at 23–29, 33, 34.

all participants, written and oral, were contained in transcripts that were issued as committee prints of the House Judiciary Committee.[92] Unless a committee indicates its approval or disapproval, information from an outside source reprinted in a committee print is ordinarily not helpful legislative history since it is not necessarily either representative of or contrary to the committee's view.[93]

■ This is an unusual case, however, because, as already noted, Congress first turned to the Copyright Office to lay the groundwork for the general revision of the copyright laws.[94] The panel discussions, at which the statements relied upon by the Snyders were made, were used by the Office to compromise differences among the various interest groups and to help it to prepare its draft revision bills, which formed the basis for the 1976 Act. Nevertheless, the House Judiciary Committee, through its chairman, expressly disavowed the statements made in the committee prints:

> In issuing this material the committee neither approves nor disapproves any of the views expressed therein. The material is issued for the information and convenience of persons interested in U. S. copyright law revision.[95]

Moreover, even if this Court were to treat the statements made at the panel discussions as equivalent to statements made directly before the Committee at its own hearings, such testimony would not be a reliable gauge of legislative intent because the views expressed by witnesses are not necessarily the same as those of the legislators ultimately voting on the bill.[96] Accordingly, statements made at committee hearings by representatives of various interests are entitled to little if any weight in interpreting Congressional intent.[97]

The Snyders contend, however, that special circumstances in this case warrant attaching persuasive force to these comments. They argue that the statements were the basis of an agreement between music publishers and songwriters as to the meaning of the derivative works exception; that the music publishers' representations as to the termination provisions and subsequent endorsement of them induced the songwriters to accept the provisions without change, and that the parties presented their agreement to Congress; and finally, that Congress accepted the termination provisions without changes material here and with no change to the Exception, in reliance upon the agreement and the music publishers' stated interpretation of the Exception.

**92.** Copyright Law Revision Part 5, *supra* note 34, at 154, 222; Copyright Law Revision Part 4, *supra* note 51, at 39–40; Copyright Law Revision Part 3, *supra* note 46, at 283, 284–85, 296–97, 318–19.

**93.** 2A C. Sands, Sutherland's Statutory Construction § 48.06, at 203 (4th ed. 1973).

**94.** H.R.Rep.No.1476, *supra* note 34, at 47, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5660.

**95.** Copyright Law Revision Part 4, *supra* note 51, at III (Forward by Representative Celler, Chairman, House Committee on the Judiciary); similarly, *see* Copyright Law Revision Part 5, *supra* note 34, at III; Copyright Law Revision Part 3, *supra* note 46, at III.

**96.** *See Austasia Intermodal Lines, Ltd. v. Federal Maritime Comm'n*, 580 F.2d 642, 645 (D.C. Cir.1978). *Accord, United States v. Public Utilities Comm'n of Cal.*, 345 U.S. 295, 319, 73 S.Ct. 706, 719–720, 97 L.Ed. 1020 (1953) (Jackson, J., concurring); 2A C. Sands, Sutherland's Statutory Construction § 48.10, at 210 (4th ed. 1973) (statements urging changes based on a certain assumed interpretation of the bill which were not adopted are "very weak" evidence that legislature adopted the assumed interpretation, "[i]n view of the possibility that the committee believed the changes were unnecessary because the assumed interpretation was erroneous.")

**97.** *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 204 n.24, 96 S.Ct. 1375, 1386 n.24, 47 L.Ed.2d 668 (1976); *McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 493–94, 51 S.Ct. 510, 512, 75 L.Ed. 1183 (1931); *March v. United States*, 506 F.2d 1306, 1314 n.30 (D.C.Cir.1974); *Pacific Ins. Co. v. United States*, 188 F.2d 571, 572 (9th Cir.) (per curiam), *cert. dismissed*, 342 U.S. 857, 72 S.Ct. 85, 96 L.Ed. 645 (1951); *cf. SEC v. Robert Collier & Co.*, 76 F.2d 939, 941 (2d Cir. 1935).

There is no affirmative evidence in the legislative history that Congress ever intended to incorporate any such alleged agreement into these provisions.[98] It is not referred to in any speech by any member of Congress or contained in any report nor is any reference thereto to be found in any Congressional Record. Had in fact Congress intended to incorporate such an agreement, it would have been a simple matter to insert a phrase in the derivative works exception that expressed that result. Instead, the Snyders must rely on Congress' silence as signifying both its understanding of and acquiescence in the agreement. However, except for minor changes to the statutory language not relevant here,[99] Congress was never apprised of the substance of the parties' alleged agreement. No reference was made to the previous statements of music publishers relied upon by the Snyders, nor was any statement made to Congress that music publishers agreed to or acknowledged their exclusion from the derivative works exception.[100] Indeed, the Snyders' claim that the parties reached an agreement to make the Exception inapplicable to music publishers is not supported by the record. It is sheer conjecture to suggest that Congress adopted a particular interpretation of the statute that purportedly reflected an agreement of opposing interests, but that was never presented to it. The argument implies that Congress surrendered its legislative prerogative to private interests in disregard of the overall public interest. At the Office's panel discussions, the music publishers as well as the motion picture producers, book publishers, record companies, broadcasters, composers and authors each had their own separate interests that they were seeking to protect. Each had lawyers presenting their respective views—advocates for each group advanced the interests of his client and sought to repel that of the other side. To accept the argument of these advocates as reflecting Congressional intent substitutes private for public intent in the enactment of legislation.

**98.** All that appears is that committee reports accompanying the 1965 Revision Bill and a subsequent bill note the Committee's awareness of an "accommodation" among affected interests. H.R.Rep.No.83, *supra* note 45, at 90; H.R.Rep.No.2237, *supra* note 61, at 119. The reports refer to the summary of this development in the Office's Supplementary Report. The Supplementary Report describes the Office's recommendations in the 1961 Report, the arguments subsequently made for and against termination, and the termination provisions as drafted by the Office in the 1965 Revision Bill. The Report makes no mention of the agreement. Supplementary Report, *supra* note 34, at 71–76.

By contrast, where Congress did intend to incorporate agreements among interested parties, the agreements were incorporated into committee reports and expressly endorsed. H.R.Rep.No.1476, *supra* note 34, at 67–72, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5681–86.

**99.** *See* Hearings on H.R. 4347, *supra* note 47, at 129–30, 134–37.

**100.** Instead, witnesses at Congressional hearings merely endorsed the provisions or told the committees conducting the hearings that a compromise had been arranged between the parties regarding the termination provisions, and that "[t]hat arrangement, in substance, was effectuated in the bill." Hearings on S. 597, *supra* note 88, at 74; *see, e.g., id.* at 44

(statement of I. Karp, counsel to Authors League of America, Inc.):

One of the problems at the outset of copyright reform was the problem of terminating transfers granted for a long term. We say nothing more about this here. We have a short comment in our written statement, because this is one of the issues that has been completely compromised, as the House report points out. I would only ask, as a word of caution, that having assumed there is no problem, should others appear to oppose this, we can refer to our House statement and ask that that be incorporated solely by reference in your committee's record.

The comment in the Authors League's written statement referred to by Karp consisted only of the following:

As the House Report [No. 2237, *supra* note 61] notes (p. 119 [*see* note 98 *supra*]) this clause represents a compromise between those concerned with the problem. The Section appears to have been accepted by all interested groups. However, should there be any opposition to it, we respectfully urge your Committee to consider our views on the problem set forth in our statement to the House Committee.

*Id.* at 57. Similarly, *see id.* at 643; Hearings on H.R. 4347, *supra* note 47, at 129–30, 134–37, 296, 998; Hearings on S. 1006, *supra* note 47, at 192.

■ Moreover, the music publishers did not make "clear, uniform and repeated" statements of their understanding of the Exception during the panel discussions, as the Snyders allege.[101] Instead there were only several statements with respect to the Exception of more or less ambiguous significance made by two witnesses representing two music publishing groups. These statements were part of the general debate still raging at that time over reversion and termination. The music publishers attacked the curtailment of rights that they would suffer under the termination provisions proposed by the Office, even if protected by the Exception.[102] Most of the statements relied upon by the Snyders attack such curtailment of the assignee's rights without making any reference to the Exception at all, or to the purported understanding that all royalties revert to the author.[103] In the remaining three statements upon which the

Snyders rely, two attorneys representing music publishers' associations protested the efforts to exclude music publishers from any income upon termination. A fair reading of these statements taken in context underscores that the music publishers were making a broad attack on the reversion of assignees' rights upon termination, and their rhetorical questions and predictions of dire results that termination would visit upon music publishers were made to reinforce their attacks.[104] These "free-wheeling utterances,"[105] some made during the very heat of controversy, provide a shallow base on which to divine Congressional intent.[106] The Supreme Court has repeatedly cautioned against relying upon the views of legislative opponents in interpreting a statute, for "[i]n their zeal to defeat a bill, they understandably tend to overstate its reach."[107] Surely, if the opposing views of

101. Snyders' Reply Memorandum of Law at 10.

102. For example, under the 1909 Act, it was possible to obtain assignments of both the original term and the expectancy in the renewal term for the full 56 years of copyright; while the Office's proposed revision bills extended the duration of copyright beyond 56 years, section 203 provided that new assignments would be terminable after only 35 years.

103. See, e.g., Copyright Law Revision Part 5, supra note 34, at 222 (statement of Julian Abeles, counsel for Music Publishers Protective Association and Harry Fox):

In the case of a music publisher, substantial efforts and expense are involved in the promotion and exploitation of a composition. Nevertheless, very few of them ever survive and become standards. Why then should the subsequent transferee reap the benefits of such few that do survive, through no efforts or expenditure on his part? Why should the term be extended for the benefit of the author and yet curtailed to the detriment of the material interests of the copyright proprietor?

Similarly, see id. at 154; Copyright Law Revision Part 4, supra note 51, at 39–40; Copyright Law Revision Part 3, supra note 46, at 283.

104. In addition, one statement was made within a discussion of re-exploitation of underlying works, thus suggesting that the statement was addressed only to rights as to new derivative works, which, all parties agree, revert to the author without limitation by the Exception. See Copyright Law Revision Part 3, supra note 46, at 296–97 (statement of Philip Wattenberg).

105. United States v. Public Utilities Comm'n of Cal., 345 U.S. 295, 321, 73 S.Ct. 706, 720, 97 L.Ed. 1020 (1953) (Frankfurter, J., concurring).

106. Cf. SEC v. Robert Collier & Co., 76 F.2d 939, 941 (2d Cir. 1935) (L. Hand, J.) ("[i]t would indeed be absurd to suppose that the testimony of a witness by itself could be used to interpret an act of Congress").

107. NLRB v. Fruit Packers, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt," quoting Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–751, 95 L.Ed. 1035 (1951)); see, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 204 n.24, 96 S.Ct. 1375, 1386 n.24, 47 L.Ed.2d 668 (1976). The Snyders cite Arizona v. California, 373 U.S. 546, 583 n. 85, 83 S.Ct. 1468, 1489 n.85, 10 L.Ed.2d 542 (1963), Parlane Sportswear Co. v. Weinberger, 513 F.2d 835, 837 (1st Cir.), cert. denied sub nom. Parlane Sportswear Co. v. Mathews, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975), and United States v. Hunter, 324 F.Supp. 529, 532–33 (D.Md.1971), aff'd, 459 F.2d 205 (4th Cir.), cert. denied, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), for the proposition that statements of opponents of a bill are relevant and useful, especially where proponents made no response to the opponents' criticisms. These cases are distinguishable, however, because in all three the opponents were members of Congress, not witness-

the members of Congress are cautioned against in the interpretation of legislation, then even greater caution is warranted as to the opposing and at times antagonistic views of advocates of private interests who bear no responsibility for the passage of legislation. The Snyders' argument depends on a long chain of speculation that is grounded on a few statements by two witnesses of varying ambiguity, and does not provide a reliable indicator of legislative intent.

■ The Court finds that the policies of the termination provisions and the Exception, as revealed by the statute and its legislative history, are consistent with the perpetuation of the royalty arrangement with regard to old derivative works under the terms of the grant after termination. Since this result is also consistent with the statutory language, the Court holds that, under the Exception, Mills continues to be entitled to royalties received from the distribution of phonorecords made from old derivative works by reason of the Snyder Grant to Mills, notwithstanding the termination.

### III.

Having found that Mills is protected by the Exception, the Court must resolve the parties' disagreement over the scope of that protection. The parties' dispute centers about two issues.

#### A. *Relicensing of Old Sound Recordings*

The first issue relates to whether, after termination, Mills or the Snyders have the right to relicense sound recordings that were prepared under licenses issued by Mills before termination.[108] The licenses issued by Fox as agent for Mills limited the record company to preparation of a sound recording of the Song for reproduction on one particular release—that is, for reproduction on a particular album, audio tape, "single" record, or other phonorecord; in substantial form these licenses specify that they are "limited to one particular recording of said copyrighted work as performed by the artist and on the phonorecord number identified" in the license.[109] If the record company desires the sound recording to be included in a new release, it must obtain a new license. For example, a record company may have obtained a license for a certain artist to record the Song and to include that sound recording in an album of the artist's songs. If the record company later wishes to re-release precisely the same sound recording of the artist's performance of the Song as a "single" or as part of a new album—such as the artist's "greatest hits" album—it must obtain a new license. The issue is whether, where a sound recording was first licensed by Mills and prepared prior to termination of the grant, Mills or the Snyders is the party authorized to license new releases of the same sound recording after termination.

The Snyders concede that "a new release of an old recording is not a new derivative work."[110] In fact, it is not a derivative work at all. The re-release of the same sound recording by a record company does not constitute a derivative work whether the sound recording is re-recorded as a "single" or on a new album. When a new release of the same sound recording is issued, only the phonorecord embodying the

---

es at hearings. There is more reason to expect Congressional proponents to respond to fellow members of Congress having different interpretations of a bill than to witnesses. For one thing, the proponents may be concerned that their fellow members' contrary interpretation was influencing them to vote against the bill.

**108.** The Court notes that its determination in this action is solely with respect to the respective claims of Mills as the music publisher under the grant from Ted Snyder and the Snyders as statutory heirs of the author who exercised the right of termination. While the Court considered the position of the record companies vis-a-vis the music publisher and the author, the record companies were not parties to this action and the Court does not here decide any claims that they may advance with respect to their rights following termination by an author.

**109.** *See* Complaint Exhs. C, D; Fox Reply to Mills Counterclaim & Exh. A.

**110.** Snyders' Memorandum of Law at 47 n.*.

sound recording has changed. The only derivative work is the sound recording, which in the case of a re-release remains the same. Re-recording the same sound recording on a new phonorecord does not contribute sufficient originality to the new release to make it a derivative work in its own right.[111]

Despite its concession, the Snyders deny that the Exception gives Mills any right after termination to authorize new releases of old sound recordings. They argue that Mills, as grantee, cannot license a new use of an old derivative work because the first license it issued in each case was limited to a single use, and the license is part of the "grant" within the meaning of the Exception.[112] Consequently, they contend that continued utilization of old sound recordings "under the terms of the grant" is limited to the single use identified and authorized under the license. According to this view, Mills would be constrained by a contractual self-imposed limitation entirely independent of the author's grant to it. Thus Mills would have eliminated its own unlimited authority under the Snyder Grant to license re-releases of old sound recordings

on new phonorecords. The Snyders seek to impose, on the basis of a limitation of use imposed *by* Mills on its own licensees, a limitation *on* Mills that was never part of Ted Snyder's Grant. Such a result is illogical.[113]

█ The Court finds that Mills may continue to license new releases of old derivative works that it first licensed prior to termination of the Snyder Grant with royalties to be shared as before termination. This result is consistent with the language of the Exception. As already found, under that language the sound recordings prepared and licensed before termination fall withhin the Exception, and as such these recordings "may continue to be utilized under the terms of the grant after its termination." [114] The grant to Mills assigned exclusive ownership of the renewal copyright in the Song, including the right to license new uses of those derivative works that fall within the Exception—in this case, sound recordings first licensed and prepared before termination—and to share the resulting royalties with the author.[115]

111. *See United States v. Taxe*, 540 F.2d 961, 965 n.2 (9th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). With respect to re-release on a new album, such as a "greatest hits" album, gathering of previously prepared derivative sound recordings into a new album is a "compilation" under the 1976 Act, rather than a derivative work. *See* 17 U.S.C. § 101 (definition of "compilation"). While there is some overlapping, the two concepts are basically different. A compilation—including the re-release of a sound recording on a new album—consists of the selection and arrangement of preexisting material without any internal changes in the material. By contrast, a derivative work does involve internal changes, in the form of recasting, transforming or adapting the preexisting material. 1 M. Nimmer, *supra*, § 3.02, at 3–4; H.R. Rep.No.1476, *supra* note 34, at 57, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5670; S.Rep.No.473, *supra* note 51, at 55; *see* 17 U.S.C. § 101 (definitions of "compilation" and "derivative work").

112. The Snyders make this argument in the alternative to their previous argument that the derivative works at issue were prepared under authority of the compulsory licenses and not of the grant and, consequently, "[n]o record producer needs permission of the Snyder defend-

ants, or Mills, or of anyone else to issue a new release of an existing recording of the Song, or even to make a new recording." Snyders' Memorandum of Law at 45.

113. The Court has considered all the other contentions made by the Snyders, and they do not require a different result.

114. 17 U.S.C. § 304(c)(6)(A).

115. Since the grants from the Authors transferred to Mills exclusive ownership of the renewal copyright in the Song, then under the Exception Mills is entitled to exercise exclusive rights in the Song with respect to old derivative works. The 1976 Act provides specifically for such divisions of the exclusive rights comprised in a copyright. 17 U.S.C. § 201(d)(2). The Act also provides that Mills, as owner of a particular exclusive right, "is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." *Id.* Thus, the protection and remedies available to the copyright owner may also be claimed by the owner of particular exclusive rights, thereby eliminating the incapacity faced by an exclusive licensee pursuant to the 1909 Act, under which the rights comprised in a copyright were indivisible. *See* 3 M. Nimmer, *su-*

## B. *Post-Termination Licenses*

The second issue concerns sound recordings prepared before termination, but first licensed after termination. The interpleader fund was generated by two types of licenses. Fifteen licenses were issued by Mills before termination (the "Pre-Termination Licenses"). With respect to these, the Court has determined that Mills is entitled to receive royalties generated during the extension. In addition, there are two instances where sound recordings were prepared prior to termination, but the licenses were issued after termination (the "Post-Termination Licenses"). The issue raised by these Post-Termination Licenses is whether under the Exception Mills can first license after termination a derivative work prepared prior to termination.

Mills argues that issuing a Post-Termination License is consistent with the line expressly drawn by the Exception between pre-termination and post-termination derivative works. Since the derivative works at issue are pre-termination derivative works—that is, a derivative work first "fixed" or "prepared" prior to the termination date—then according to Mills it had the right, even after termination, to issue the license as part of the continued utilization of derivative works under the Exception.

The Court rejects Mills' argument. The line drawn by the two provisions of the Exception is between derivative works prepared under authority of the grant before termination (old derivative works) and "other works" prepared after termination (new derivative works). Mills recognizes that to fall within the Exception pre-termination derivative works must be prepared under the authority, or what it calls the "auspices," of the grant. It suggests that that condition was met here because the sound recordings were "prepared prior to the termination date by a User *in contemplation of obtaining a license* from Mills under authority of the Grant and without knowledge of any impending termination of rights." [116] But "in contemplation of obtaining a license" under authority of the grant is not the same as under authority of the grant. The Exception specifically requires that the "derivative work [be] prepared under authority of the grant before its termination," rather than simply that the derivative work be prepared before termination. Moreover, the amorphous phrase "in contemplation of obtaining a license" leaves an escape hatch that may deprive the author of the benefits of termination. The Court finds that the Exception did not preserve Mills' right to issue the Post-Termination Licenses. The record companies may either avail themselves of compulsory licenses or negotiate licenses from the Snyders, and all royalties corresponding to these sound recordings revert to the Snyders.

### *Conclusion*

The Exception preserves Mills' rights under the terms of the grant to share the royalties from derivative works prepared and licensed by it before termination of the grant. Those royalties in the interpleader fund or otherwise at issue corresponding to such works shall be transferred to Mills for it to divide with the Snyders under the terms of the grant. In addition, under the Exception Mills is entitled to issue licenses for new releases of these old derivative works. The Exception does not preserve any of Mills' rights as to derivative works prepared after termination or those prepared but not licensed by Mills prior to termination. Those royalties at issue corresponding to such works revert to the Snyders, and the Snyders are entitled to recover under their cross-claim to the extent it consists of such royalties.

---

pra, § 10.02[C][2], at 10–30. Further, as defined in the 1976 Act, " 'copyright owner,' with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right." 17 U.S.C. § 101. Accordingly, Mills may be identified as the copy-right owner on notices of copyright appearing on phonorecords made from old sound recordings. *See* § 402(b)(3).

**116.** Mills' Memorandum of Law at 6 (emphasis added).

Submit judgment in accordance with the foregoing with notice of settlement returnable within seven (7) days upon three (3) days' notice to the opposing side.

So ordered.